# Noble & al.

## v.

## Davies & al.

*(Supreme Court of Appeals of Virginia, November 10, 1887.)*

[4 S. E. Rep. 206.]

**Husband and Wife—Antenuptial Settlement—Fraud on Creditors— Knowledge of Wife.\***

In an action against a husband and wife to set aside an antenuptial deed of marriage settlement, on the ground that the same was given with intent to defraud the creditors of the husband, and that the wife had connived at the fraud, the entire testimony showed that the wife, before marriage, had no knowledge of any fraud in the settlement: *held*, that the court properly refused the request of the complainants to direct an issue out of chancery to try the question of fraud and connivance, and that a decree declaring the deed valid as to the wife was in accordance with the evidence.

**Same—Same—Proof of Fraud.**

Fraud cannot be presumed in an action to set aside a marriage settlement, but must be proved by clear and satisfactory evidence to have been concurred in by both parties. And this is so, irrespective of the amount of the husband's indebtedness, and even though his whole estate is included in the settlement.†

Lacy and Richardson, JJ., dissenting.

---

\*See foot-note to Herring *v.* Wickham, 29 Gratt. 628 (Va. Rep. Anno.); also, monographic note on "Fraudulent and Voluntary Conveyances," Va. Rep. Anno.

†A deed of real estate made in consideration of marriage is good against creditors to whom the grantor was indebted at the time of the execution of the conveyance, where the grantee is ignorant of any intent to delay or defraud creditors. Pierce *v.* Harrington (Vt.), 7 Atl. Rep. 462. To render a conveyance void for fraud upon creditors, it is necessary that the grantee should have a knowledge of, and in some way participate in, the fraud. Fraser *v.* Passage (Mich.), 30 N. W. Rep. 334, and note; Schroder *v.* Walsh (Ill.), 11 N. E. Rep. 70; Beurmann *v.* Van Buren (Mich.), 7 N. W. Rep. 67; Beasley *v.* Bray (N. C.), 3 S. E. Rep. 497.

Appeal from circuit court of city of Lynchburg.

*J. W. Daniel* and *E. S. Brown,* for plaintiffs.

*Kean & Kean* and *J. H. Lewis,* for defendants.

FAUNTLEROY, J., delivered the opinion of the court.

This is an appeal from a decree of the circuit court of the city of Lynchburg, rendered on the fourteenth day of May, 1885, in the chancery suit of John D. Noble and others, complainants, against A. M. Davies & Co. and others, defendants. The petition of appellants is limited to a prayer for appeal from so much only of the said decree of the said circuit court as refuses to direct an issue out of chancery, to try the question of fraud on the part of the defendant John R. Maben, and of guilty knowledge of and connivance therein on the part of the defendant Jessie M. Maben, in the antenuptial deed of marriage settlement of November 30, 1881, made by said John R. Maben for the benefit of the said Jessie M. (then Jessie M. Bremner), in contemplation of a marriage between them, which marriage was duly solemnized December 1, 1881; and secondly from so much of the said decree as affirms the validity of the said deed of settlement as to the said Jessie M., the wife of the said John R. Maben.

The material facts disclosed by the record are as follows: The defendant John R. Maben, a citizen of Campbell county, conceded to have been worth $50,000 or more, and the defendant A. M. Davies, a citizen of Lynchburg, also estimated to have been worth at least $25,000, were before and on the thirtieth day of November, 1881, partners and brokers in Lynchburg, doing an apparently prosperous business. On the thirtieth of November, 1881, their said partnership was dissolved by mutual consent. During the course of their said partnership business, the said firm had in their hands for negotiation a number of negotiable notes drawn by one

William T. Hart for large amounts, payable to Joseph Cloyd
(a citizen of Pulaski county of large wealth and assured
credit), and purporting to be endorsed by said Cloyd, whose
name was on the backs of the said notes.   The said A. M.
Davies & Co. negotiated these notes ; the defendant John R.
Maben taking $10,000 of them on his individual account,
and others of them were discounted by the complainants J.
D. Noble, Scott & Noble, J. P. Krise, Winfree & Lloyd, etc.
There is no imputation of bad faith on Davies & Co. in the
negotiation of these notes.   They had full confidence in the
genuineness of Cloyd's indorsement upon them, which gave
the paper its value, and in evidence of their *bona fides* the
partner J. R. Maben bought $10,000 of it for his individual
account.   At maturity of the said notes, Cloyd refused to
pay them, and pronounced the indorsement of his name
thereon a forgery.   About this time William T. Hart, the
maker of the said notes, absconded, and in suits upon it
against Hart & Cloyd, the indorsements of Cloyd's name
thereon were proved and adjudicated forgeries, and the
paper thus proved of no value.   Thereupon the purchasers
of the said notes asserted a liability on the firm of A. M.
Davies & Co., as guarantors, and demanded of them to be
reimbursed by them the sums of money which they, the pur-
chasers, had paid to the said firm for the said forged and
worthless notes.   This the said firm declined to do, and
denied their liability as guarantors.   Suits at common law
were instituted in the corporation court of Lynchburg by
Noble, Scott & Noble, Krise, Winfree, etc., which were
matured for hearing at the term which began December 1,
1881 ; but the suits were continued for the defendants at
that term until the March term, 1882, when judgments for
the plaintiffs in said suits were rendered to the aggregate
amount of $17,853.33, principal, of which the sum of
$9,453.33 was in favor of the plaintiffs J. D. Noble and Scott
& Noble.   By these forgeries J. R. Maben became the

loser to the amount of $10,000, the aggregate of the said forged notes which he bought and held individually.

On the thirtieth of November, 1881, Miss Jessie M. Bremner, a lady of some 40 years of age, was residing at the Bedford Alum and Iron Springs, where she had been employed for nearly two years as mistress of the linen, and as housekeeper. John R. Maben was part owner of the said springs, and was the manager thereof, and he resided there also. He was a widower 60 years of age, and of Scottish birth, as was Miss Bremner. They had been acquainted since 1872, when Miss Bremner had been a visitor at said Maben's house, at the invitation of his grown daughter, who was then and has been ever since her warm and fast friend. In 1878 said Maben visited Miss Bremner at the house of a friend of hers in Richmond, where she was staying, and there contracted an engagement with her for a nuptial settlement and marriage between them, which said engagement subsisted and was adhered to by them, though the consummation was delayed and postponed until the said Maben could or should complete the extensive and costly improvements at the springs which he was then making, and should get released from that management, and could have a more private and satisfactory home. On the thirtieth of November, 1881, John R. Maben was at Amherst Courthouse, and had prepared by his counsel there an antenuptial settlement in consideration of the intended marriage with said Jessie M. Bremner. This draft of marriage settlement Maben brought to Lynchburg that day, had a duplicate of it made, went out to the springs, and returned from there to Lynchburg about 7. p. m., bringing Miss Bremner with him. They went to the clerk's office of the corporation court, where the clerk awaited them by the request of J. R. Maben. There said Maben and Miss Bremner signed and acknowledged both of the said drafts (the original and the duplicate), and one of them so signed and acknowledged was

delivered to the clerk, and by him was admitted to record. This deed of settlement conveyed all of said Maben's assets (except some specie and other articles of personalty) to Pitt Woodruff (Maben's son-in-law), as trustee, for the benefit of the said Jessie M. Bremner after the said marriage. The duplicate of the said deed was then sent by J. R. Maben by a special messenger to Amherst Courthouse for record, and it was there delivered to the clerk of Amherst county court before 12 midnight of the thirtieth day of November, 1881, by whom it was duly recorded the next day, December 1, 1881. J. R. Maben and Jessie M. Bremner returned to the Bedford Alum and Iron Springs on the thirtieth of November, 1881, and the next day, December 1, 1881, they were duly married at the Springs Hotel, where they resided. The property conveyed by the said deed of marriage settlement was, in a few days, placed in the possession of the said Pitt Woodruff, the trustee.

A. M. Davies, the partner of Maben, had, prior to the thirtieth of November, 1881, conveyed his property to trustees for his wife and some preferred creditors. The executions on the said judgments recovered at the March term, 1882, against A. M. Davies & Co. having been returned "No property," the judgment creditors, J. D. Noble and Scott & Noble, proceeded against the individual, as well as partnership, assets of Maben and of Davies, and filed their original bill in the circuit court of the city of Lynchburg, making J. R. Maben, Jessie M. Maben (late Bremner), Pitt Woodruff, trustee, A. M. Davies and his wife, M. A. Davies, and others, the trustees in the Davies deeds, parties defendant, and requiring answers on oath, and charging, among other things, that this deed of settlement by J. R. Maben of November 30, 1881, was made with intent to delay, hinder, and defraud complainants and others, creditors of J. R. Maben, and that the said Jessie M. Maben (late Bremner) had connived at the fraud ; and pray-

ing that the said deed of marriage settlement should be annuled and set aside, and the property therein conveyed should be subjected to the payment of their said judgments. In the progress of the suit J. P. Krise and Winfree & Lloyd and other creditors of A. M. Davies & Co. became parties by petition and cross-bill. Most voluminous testimony by depositions and documents was taken, much of which is wholly irrelevant to the actual issue involved. We have, for the purpose in hand, to consider only so much of it as pertains to the question of the validity of the said marriage settlement, and to Mrs. Jessie M. Maben's title under it.

The complainants asked that an issue out of chancery be directed to try the question of fraud in the said settlement of November 30, 1881, by J. R. Maben, and of Jessie M. Maben's guilty knowledge of, and connivance and complicity therewith. The circuit court, with all the evidence and pleadings before it, refused to direct the issue ; and on the fourteenth of May, 1885, by final decree, decided that the deed of November 30, 1881, was void as to John R. Maben, but is valid as to Jessie M. Maben, and affirmed the settlement made by the said deed as to her, except that the partnership assets should be first applied to the payment of partnership debts. From this refusal of the circuit court to direct an issue, and this affirmance of the validity of the said deed of marriage settlement, the original complainants, J. D. Noble and Scott & Noble, applied for and obtained this appeal.

The sole question submitted for the decision of this court by this appeal is whether the circuit court erred in affirming the validity of the marriage settlement deed of November 30, 1881, made by J. R. Maben for the benefit of his intended wife, Jessie M. Bremner, and in not directing an issue out of chancery in the cause. This case is governed by the decision of this court in the case of Herring v. Wickham, 29

Gratt. 628, followed by the late case of Clay v. Walter, 79 Va. 92.

In Herring v. Wickham, *supra,* Judge Staples, delivering the unanimous opinion of this court, defines the law applicable to the case at bar with great clearness and emphasis. If the grantee in a deed be a *bona fide* purchaser for a valuable consideration, his or her title is unassailable, whatever may have been the motives or intentions of the grantor in executing the deed. It is absolutely essential that both parties shall concur in the fraud, to invalidate the deed. Fraud cannot be presumed ; it must be proved by clear and satisfactory evidence. Marriage is a valuable consideration, sufficient to support a conveyance of property, even against creditors ; and in such a case the wife is deemed a purchaser of the property settled on her, in consideration of the marriage, and is entitled to hold it against all the world. However much a man may be indebted, an antenuptial settlement made by him in consideration of marriage is good against his creditors, unless it appears that the intended wife was cognizant of the fraud. And even though it conveys his whole estate, it is not simply on that account void. And when a settlement is made in contemplation of marriage, the law presumes it was an inducement to it, and the courts cannot assume the contrary to be the fact.

In the case of Clay v. Walter, *supra,* Judge Lacy, delivering the opinion of the court, said : ''After the late case of Herring v. Wickham, in this court [29 Gratt. 628], it may be said, as was contended in argument here in this case by the learned counsel for the appellant, that it is now beyond dispute that, whatever was the design of her husband, the settlement upon his wife in contemplation of marriage, and with marriage as the expressed consideration, is valid, as such settlement is upon valuable consideration, unless a knowledge of the intended fraud is proved by clear and satisfactory evidence. Does the record show that the intended

wife had knowledge of, and participated in, the intended
fraud, if any such existed.   This knowledge cannot be pre-
sumed.   There is no reason to believe that an intended hus-
band would confess his guilt, if any, to his intended wife on
the eve of their marriage.   It is not pretended that any
knowledge was brought to Mrs. Clay of this intended fraud,
except such constructive notice and knowledge as she may
be held to have had from a service of this paper writing left
with her."

Do the pleadings and proofs in this record show clearly
and satisfactorily that Miss Jessie M. Bremner was cogni-
zant of, and participated in, any fraudulent intent or design
of J. R. Maben in making the marriage settlement upon her
by the deed of November 30, 1881, even if any such obtained?
We think they do not; and there is nothing in the record to
justify even any suspicion of connivance in or knowledge of
any fraud in the transaction, on her part; and it is but just
to J. R. Maben to impute to him, as his moving and con-
trolling motive in making the settlement, the honorable
design of fulfilling his solemn, long-standing, and binding
engagement and legal contract for a settlement and marriage,
long antedating any of the claims or debts asserted against
him.

The bill calls for the answers of J. R. Maben and Jessie
M. Maben on oath, and in their answers, they, both and
each, directly and emphatically respond to the allegations of
the bill, and deny any fraud in the transaction, and any
knowledge by Mrs. Maben of any fraud in law or morals
tainting the said settlement.   Her deposition, which was
taken, and her answers to interrogatories filed by the plain-
tiffs, are in entire accord with her answer to the bill and
cross-bill.   In the whole vast mass of testimony in the rec-
ord, there is but one witness, John M. Echols, who makes
any attempt to prove knowledge by Jessie M. Bremner of
any financial difficulty of J. R. Maben.   He testifies to oc-

casions of conversations with her, before the marriage, of
which he remembered nothing specially, except that she ex-
pressed sympathy with him on account of the financial trouble
he had gotten into.    This is entirely consistent with her own
statement in her answer, and elsewhere in the record, that
she did know that J. R. Maben was a loser by the Hart
notes to the amount of $10,000.    The witness Echols says
in his evidence in chief that J. R. Maben was supposed to
be a man of considerable wealth, and the petition and bill
aver that Maben was worth on thirtieth November, 1881,
when the deed of settlement was made, $50,000, while the
aggregate amount of the judgments against the firm of which
he was a member, recovered in March, 1882, was only about
$18,000, and those of the complainants only $9,453, to be
borne by both partners, and by the partnership assets.    The
witness Echols is shown by the record to be unworthy of
credit ; and even those who testify most favorably for his
credit say that he is given to very loose and exaggerated
statements, and he is proved to have had a bitter enmity to
J. R. Maben and those connected with him.    But assuming
the exact truth of Echols' testimony, it proves nothing of
knowledge by Miss Bremner before marriage of any insol-
vency, or even of any indebtedness, of her intended husband,
nor of any suits against him, or against the firm of which
he was a member.    She only knew his repute for wealth
and his loss of $10,000.    What she may have learned after
the marriage cannot affect the question, and is wholly ir-
revelant.

Equally irrevelant, and most unjustifiable, is the bitter
and cruel personal assault made upon the character of Miss
Bremner by the plaintiffs in the court below.    She is proved
by many witnesses of unimpeached and the highest credi-
bility, both for their respectibility and close and critical
acquaintance with her, and long observation of her, to have
been a lady of irreproachable character, cultivated mind,

modest and diffident, and refined in manners and demeanor, and recognized and received by the best of her neighbors in the country and in the cities, including Richmond. She had three brothers, men of business and character, in Virginia and in Baltimore, who were able and anxious to give her a comfortable home with them, and who did supply her with money when she needed it. She was independent in spirit, and preferred to earn her own support, so far as she could, and in 1880 and 1881 she accepted and filled the position of mistress of the linen and housekeeper at the Bedford Alum and Iron Springs (kept open all the year), and discharged her duties there faithfully. She had had a long acquaintance with J. R. Maben, who had known her as the friend and visitor of his daughter, and at the houses of her friends residing in Richmond, where, in 1878, at the house of Mrs. Clark, he had paid to her his addresses, and had formed an engagement with her for marriage, to be preceded by a marriage settlement. She had waited in patient confidence in Maben's fidelity to his contract ; and when the fulfillment came at last, she acceded to it faithfully, without knowledge or suspicion of any wrong in the performance of a *bona fide* and honorable contract of settlement and marriage with her by J. R. Maben, who most naturally would not have communicated to her any knowledge of his own dishonest design, even though he were so actuated. She answers and also testifies that she knew nothing of the preparation of the deed of settlement, or of the object of the visit to Lynchburg on thirtieth November, 1881, until they were on the way there ; that she signed the two drafts when requested, being told that they were settlements ; that she did not read either of them, and did not know, until a fortnight or more after the marriage, what property was conveyed by the settlement. She proves that she knew nothing of Mr. Maben's fortune or circumstances beyond the general reputation that he was a man of wealth, and knew nothing of his embarrassments

beyond the fact that he was a loser to the amount of $10,000 by the Hart forgeries.   There is nothing in the proofs in the cause to throw even suspicion upon Miss Bremner of any knowledge of fraud in the transaction or design of fraud by Maben.   She had long expected the settlement and marriage, and she accepted the fulfillment of Maben's contract with her as a matter of course.   Being a lady of forty, and he being sixty, they could well dispense with the preliminary preparations which a younger couple might have desired. In all the evidence in the record there is no conflict of testimony as to Miss Bremner's having no cognizance of or complicity in, any fraud, either technical or actual, in the settlement ; and in this state of the evidence the circuit court could not have properly directed an issue, but was bound to decide the cause on the testimony and the pleadings.   See Code 1873, c. 178, § 2 ; Reed v. Cline, 9 Gratt. 136 ; Elder's Ex'rs v. Harris, 75 Va. 72, 73 ; Carter v. Carter, Va. Law J. May, 1887, p. 275.   It was the duty of the circuit court to decide the cause without referring it to a jury ; and in deciding it upon the proofs and pleadings, he could, under the authority of Herring v. Wickham and Clay v. Walter, make no other decree than the decree complained of.

We are of opinion to affirm the decree.

HINTON, J., concurring.   LACY and RICHARDSON, JJ., dissenting.   LEWIS, J., not sitting.